UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3
    UNITED STATES OF AMERICA,    )
4                                ) CAUSE NO.
          Plaintiff,             ) 1:19-cr-00074-JRS-DML
5                                )
          -vs-                   )
6                                ) Indianapolis, Indiana
    BRANDON MODGLIN,             ) September 16, 2020
7                                ) 9:00 a.m.
          Defendant.             )
8

9                       **BEFORE THE**
            **HONORABLE JAMES R. SWEENEY II**
10

11        OFFICIAL REPORTER'S TRANSCRIPT OF

12          PLEA AND SENTENCING HEARING

13

14
    FOR THE PLAINTIFF:           Jeremy A. Morris
15                               Assistant United States Attorney
                                 10 West Market Street
16                               Suite 2100
                                 Indianapolis, IN  46204
17
    FOR THE DEFENDANT:           Andrew J. Borland
18                               Law Office of Andrew Borland
                                 320 North Meridian Street
19                               Suite 506
                                 Indianapolis, IN  46204
20

21

22  Court Reporter:    Cathy Easley Jones, RDR, FCRR
                       Official Court Reporter
23                     46 East Ohio Street, Room 290
                       Indianapolis, IN  46204
24

25        PROCEEDINGS TAKEN BY MACHINE SHORTHAND
            COMPUTER-AIDED TRANSCRIPTION

1    *(In open court)*

2        THE COURT:  Good morning.  Please be seated.

3        We're on the record in United States of America

4    versus Brandon Modglin --

5        Did I say that correctly, Mr. Modglin?

6        THE DEFENDANT:  Modglin.

7        THE COURT:  -- which is Cause 1:19-cr-74, and we're

8    here on a petition to enter a plea of guilty; and I take it

9    since you answered up, that that's you behind that mask,

10   Mr. Modglin?

11       THE DEFENDANT:  Yes, sir.

12       THE COURT:  Why don't you try that again.

13       THE DEFENDANT:  Yes, sir.

14       THE COURT:  Okay, great.

15       On behalf of Mr. Modglin, Mr. Borland, welcome to

16   you, sir.

17       MR. BORLAND:  Good morning, Your Honor.

18       THE COURT:  Good morning.

19       On behalf of the United States, Assistant U.S.

20   Attorney Jeremy Morris.  Welcome to you, sir.

21       MR. MORRIS:  Good morning, Your Honor.

22       THE COURT:  The probation officer this morning is

23   Mr. Harrold.  Welcome to you, sir.

24       PROBATION OFFICER HARROLD:  Good morning, Your

25   Honor.

1          THE COURT:  Our court reporter is Cathy Jones.

2          Any victims today, Mr. Morris?

3          MR. MORRIS:  No, Your Honor.

4          THE COURT:  So we have taken the proper precautions

5 for COVID here.  We've cleaned everything between all

6 proceedings.  We have these removable covers on the mics, and

7 those are replaced after each proceeding as well.

8          Where there are two people at the table, if for some

9 reason you think that you need to remove your masks to address

10 the Court, that's okay.  I'll leave that up to you, so long as

11 at least one person at the table has a mask on.

12          As I said, we're here on a petition to enter a plea

13 of guilty, which appears at ECF-41.

14          Mr. Modglin, what we'll do here shortly is give you

15 an oath, go over your background and ability to understand

16 what's going on here, talk about your petition to enter a

17 plea, to include the charges and potential penalties that you

18 face, and then take your plea.

19          Any questions about that?

20          THE DEFENDANT:  No, sir.  I would like to state for

21 the record, though, I have a little bit of a hearing problem.

22 So it's kind of hard for me to --

23          THE COURT:  All right.  We'll take care of that

24 right now.

25          THE DEFENDANT:  Thank you.

1          THE COURT:  The courtroom deputy will get you a

2    hearing device that will allow you to hear.  So we'll test it

3    here shortly.

4          All right, Mr. Modglin, how is that working for you?

5          THE DEFENDANT:  Much better, thank you, sir.

6          THE COURT:  All right.  Great.  Would you raise your

7    right hand, please?

8    *(The defendant was sworn.)*

9          THE COURT:  All right.  You understand that you're

10   now under oath, and that if you make any false statements,

11   those can be used against you in a subsequent proceeding for

12   making a false statement or for perjury?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Let's talk just briefly about the

15   presentence investigation report -- we may call that the PSR

16   for short or the presentence report -- that appears at ECF-42,

17   and that was entered on the record on July 31st.  Do you

18   recall the first time you had a copy of that in your hand?

19   Was that more than 35 days ago?

20         THE DEFENDANT:  No.  It's been more than 35 days.

21         THE COURT:  It's been more than 35 days?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  So we've met the requirements of

24   Rule 32.

25         Please state your full name.

1          THE DEFENDANT:  Brandon Charles Modglin.

2          THE COURT:  All right.  Mr. Modglin, where were you

3   born?

4          THE DEFENDANT:  Indianapolis, Indiana.

5          THE COURT:  How old are you, sir?

6          THE DEFENDANT:  I'm 37.

7          THE COURT:  How far did you go in school?

8          THE DEFENDANT:  Tenth grade.

9          THE COURT:  Tenth grade.  That was at Greenville?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Greenville High School in Tennessee?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  And you left there in 10th grade, and

14   you have not done any schooling since that time; is that

15   right?

16         THE DEFENDANT:  Unfortunately not, sir, no.

17         THE COURT:  Okay.  But you can read and write

18   English well enough to have understood the charges pending

19   against you?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Have you been treated for any mental

22   illness?

23         THE DEFENDANT:  In the past, yes, sir.

24         THE COURT:  Why don't you tell me about that.

25         THE DEFENDANT:  I've been to Midtown for bipolar,

1  paranoid --

2          THE COURT:  Bipolar or just paranoid schizophrenia?

3          THE DEFENDANT:  Paranoid schizophrenic, yes, sir.

4          THE COURT:  What else?

5          THE DEFENDANT:  Just bipolar and paranoid

6  schizophrenic.

7          THE COURT:  Well, how about Advantage Counseling,

8  Don Dudley; is that right?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  What was that for?

11         THE DEFENDANT:  That was for drug use.

12         THE COURT:  Okay.  So that was for addiction to

13 narcotic drugs?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  So Midtown with respect to paranoid

16 schizophrenic, depression, nervousness, anxiety?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  And then Mr. Dudley at Advantage

19 Counseling with respect to drug addiction; is that right?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  And that was Wellbutrin?

22         THE DEFENDANT:  Wellbutrin --

23         THE COURT:  Benzo- -- I'm sorry.  Go ahead.

24         THE DEFENDANT:  I'm sorry.  Zyprexa, Wellbutrin, and

25 Artane.

1        THE COURT:  What about benzodiazepine?

2        THE DEFENDANT:  That's the drug that I misused.  The

3   names that I just named prior to that were the mental health

4   medicine, sir.

5        THE COURT:  So the Wellbutrin and the Zyprexa and

6   the --

7        THE DEFENDANT:  Artane, sir.

8        THE COURT:  Artane?

9        THE DEFENDANT:  Yes, sir.

10       THE COURT:  Those were prescription's?

11       THE DEFENDANT:  Yes, sir -- no, those were mental

12  health prescriptions, yes.

13       THE COURT:  Yeah, but those were prescribed to you?

14       THE DEFENDANT:  Yes, sir.

15       THE COURT:  Then you abused the benzodiazepine; is

16  that right?

17       THE DEFENDANT:  Yes, sir.

18       THE COURT:  Are you taking any of those medications

19  today?

20       THE DEFENDANT:  No, sir.

21       THE COURT:  Nothing?

22       THE DEFENDANT:  No, sir.

23       THE COURT:  Why is that?

24       THE DEFENDANT:  Well, unfortunately, the jail that

25  I'm at, they charge for mental health medicine.  I've been

1  back and forth with them about it, and they tried to put me on

2  something that wouldn't work.  So I just --

3           THE COURT:  What was that?

4           THE DEFENDANT:  Remeron.

5           THE COURT:  Why wasn't that working?

6           THE DEFENDANT:  It was giving me restless legs.

7           THE COURT:  All right.  So not being on those,

8  Artane, Zyprexa -- Zyprexa, is that mental or is that allergy

9  or something?

10          THE DEFENDANT:  The Zyprexa is for the paranoid

11  schizophrenic, and the Artane and the Wellbutrin is for the

12  mood swings and bipolar.

13          THE COURT:  How are you doing without those right

14  now?

15          THE DEFENDANT:  I'm all right.  I'm up and down, but

16  I'm all right.

17          THE COURT:  So you're surviving okay?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Your head's clear today?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  You understand what I'm saying to you

22  today?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Any other medication, anything for

25  allergies, for example, headaches, anything at all that you're

1 taking?

2          THE DEFENDANT:  No, sir.

3          THE COURT:  Okay.  You're not hearing any voices or

4 anything like that?

5          THE DEFENDANT:  No, sir.

6          THE COURT:  You don't have any mood swings right now

7 as we sit here right now?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  And you're not -- we have already talked

10 about drugs, medications.  You're not under the influence of

11 any alcoholic beverage, are you?

12          THE DEFENDANT:  No, sir.

13          THE COURT:  Well, if at any time you don't

14 understand what's going on here today, feel free to ask me any

15 questions you may have.

16          THE DEFENDANT:  Okay.  Thank you.

17          THE COURT:  You can also ask your attorney; and you

18 can do that in private if you need to, okay?

19          THE DEFENDANT:  Thank you.

20          THE COURT:  Now, have you received a copy of the

21 indictment, which are the written charges pending against you

22 in this case?

23          THE DEFENDANT:  I have, Your Honor, yes, sir.

24          THE COURT:  And have you fully discussed those

25 charges and the case in general with your attorney?

1          THE DEFENDANT: Yes, sir.

2          THE COURT: Are you fully satisfied with the

3 counsel, representation, and advice given to you in this case

4 by Mr. Borland?

5          THE DEFENDANT: No, sir.

6          THE COURT: All right. What's the matter?

7          THE DEFENDANT: I don't want to upset the courts. I

8 don't want you to be mad or hold this against me. I've just

9 got some issues or concerns.

10         THE COURT: I'm not going to be mad at you. We just

11 need to make sure -- and certainly, Mr. Borland is a very fine

12 attorney. Now, you may disagree on some things; but as long

13 as he's given you his best legal advice, he's a trained and

14 very experienced attorney, especially in these matters.

15         Now, we don't always like to hear what somebody

16 tells us. So why don't you let me know -- is there a

17 disagreement on strategy here? Is it something you don't want

18 to plead guilty to? What's going on?

19         THE DEFENDANT: I just feel like we could have

20 properly prepared a little bit better, and there's some things

21 that I inquired about and would like to pursue.

22         THE COURT: Like what?

23         THE DEFENDANT: Well, the gun being stolen. I've

24 asked Mr. Borland --

25         THE COURT: Let me stop you right there. So we're

going to get into that. Here's the deal. You have the
absolute right to go to trial -- and I'm going to get into
that here -- and contest anything that you want; but you can't
have it both ways. I mean, you're either pleading guilty or
you go to trial; but that's up to you.

Now, what happens in between there is up to
Mr. Borland; and he is, again, the professional here. And so
I'm guessing that what you're trying to say is that you think
that you ought to contest the enhancement that the firearm was
stolen?

THE DEFENDANT: Yes, sir.

THE COURT: That's certainly an argument that he can
make, unless he doesn't think that it's true; and of course,
he can't do that, if that's the case.

Are you saying that you didn't steal it?

THE DEFENDANT: I'm saying that I didn't steal it,
and I've never seen -- I've been asking to see proof that the
gun was actually stolen.

THE COURT: Okay. Does this enhancement under
2K2.1, Mr. Harrold, require that the defendant have stolen it?

PROBATION OFFICER HARROLD: It does not, Your Honor,
just that the firearm was reported previously stolen.

THE COURT: Do you understand that, Mr. Modglin?

THE DEFENDANT: Yes, sir.

THE COURT: It doesn't mean that you stole it. It

1  just means that at sometime in its lifetime, it was stolen.

2  Do you have some information that's contrary to that?

3          THE DEFENDANT:  I bought it offline --

4          THE COURT:  No, no, no.  Listen to what I'm saying.

5          THE DEFENDANT:  Yes, sir.  Yes, sir.

6          THE COURT:  It doesn't make any difference what you

7  did.  Do you have some information that either who you bought

8  it from or somebody else didn't steal that weapon?

9          THE DEFENDANT:  No, sir.

10         THE COURT:  Well, then how can you make that

11 argument?

12         THE DEFENDANT:  You're right, sir.

13         THE COURT:  Well, I don't know that I'm right.  I'm

14 just asking you how you think you can make that argument.  I'm

15 guessing that Mr. Borland has asked the same thing.

16         THE DEFENDANT:  I was just under the impression that

17 I had the right to actually see proof that it was stolen.

18         THE COURT:  Well, everything as far as proving the

19 charges against you -- and we'll get into this, too -- the

20 government has to prove beyond a reasonable doubt.  Now,

21 that's an enhancement that I determine based on a

22 preponderance of the evidence, which is a whole different

23 standard.  So we can certainly get into that and we will; and

24 we'll see what that says, okay?  What else?

25         THE DEFENDANT:  I'm just kind of nervous, sir.

1      THE COURT:  Well, everybody's nervous.  Don't worry.
2  We're here for you.
3      THE DEFENDANT:  I just feel like -- Mr. Borland and
4  I -- we really didn't get much time to actually talk about,
5  you know, what was going to be said today or what I should say
6  today or, you know, what to expect or anything; and I just
7  kind of felt -- I just kind of felt that we could have
8  prepared a little bit better and discussed some things.
9      THE COURT:  I certainly know from experience that
10  Mr. Borland is prepared, will be prepared.  This is -- as you
11  say, you're nervous.  That's normal.  For you, it may be
12  something new.  It's a pretty run-of-the-mill thing, though, a
13  felon in possession of a firearm.  It's not a complicated
14  thing.
15      But we can take as little or as much time as you
16  need, and you can confer with him.  We can come back, but it's
17  still going to be the same charge.  It's still going to be the
18  same enhancement that I have to look at.  It's still going to
19  be the same result unless you decide you don't want to plead
20  guilty -- and I shouldn't say "the same result."  I don't know
21  what the result's going to be until I hear what the parties
22  have to say.  I doubt the parties are going to have anything
23  different to say.  I doubt you're going to have anything
24  different to say, other than what the truth is, how you feel.
25  So -- and only you know that.  You can't be prepared for that,

1  right?  We can't tell you what to say.

2          Now, I'm guessing that he gave you some pointers,

3  maybe, on what might be important to discuss; but as I said,

4  you can take some time to consult with him.  You can decide

5  that you don't want to plead guilty, and you want to go to

6  trial.  So that's all up to you, as I said.

7          We will get to that point here where I will ask you

8  how do you plead, and you at that time can plead guilty or you

9  can plead not guilty.

10          THE DEFENDANT:  I plead guilty, sir.

11          THE COURT:  Well, no, no, no.  We're not to that

12  point yet.

13          THE DEFENDANT:  Okay.  I'm sorry.

14          THE COURT:  We will get to that point.  But I can

15  see -- I just want to make sure that before we proceed any

16  further, we get over this portion with respect to you and

17  Mr. Borland.

18          This is not unusual either, because sometimes we get

19  information we don't want to hear or learn things that we

20  don't want to know.  And again, he has given you, I'm sure,

21  his best professional advice; and he is very adept and very

22  experienced in this.  So -- but that doesn't mean that you

23  like what he says.

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Does that make sense?

1       THE DEFENDANT:  Yes, sir.

2       THE COURT:  Is there anything else you want to talk

3  about with respect to that?

4       THE DEFENDANT:  I just want to say for the record I

5  do respect Mr. Borland, and I don't want it to feel like I'm

6  putting down anyone in the courts or doubting their

7  capabilities or anything like that.  It was just some issues

8  and concerns I had; but I think at this point, I'll just trust

9  in Mr. Borland and move forward.

10      THE COURT:  Well, let's see how it goes, okay?

11      THE DEFENDANT:  Yes, sir.

12      THE COURT:  We've got some things to go through

13  before that.  So let's just continue on that.

14      So I'm going to turn to Mr. Borland now.

15  Mr. Borland, were all formal plea offers by the government

16  conveyed to Mr. Modglin?

17      MR. BORLAND:  Yes, Your Honor.

18      THE COURT:  And Mr. Morris, did Mr. Modglin receive

19  the benefit of the most lenient offer the government was

20  prepared to make?

21      MR. MORRIS:  Yes.

22      THE COURT:  But no agreement was accepted; is that

23  right, Mr. Borland?

24      MR. BORLAND:  That's right.  After consultation,

25  Mr. Modglin decided to plead open to the Court to preserve

1  certain issues.

2  THE COURT:  Okay.  But he did get and was

3  conveyed -- the most lenient offer the government was prepared

4  to make was offered, and that was conveyed to Mr. Modglin; and

5  he decided to proceed with an open plea; is that right?

6  MR. BORLAND:  That is correct, Your Honor.

7  THE COURT:  Okay.  Thank you.

8  Well, Mr. Modglin, let's turn to the second page of

9  your petition to enter a plea of guilty, which is ECF-41; and

10  your typed name is there.  Is that your signature above that

11  typed name?

12  THE DEFENDANT:  Yes, sir.

13  THE COURT:  Did you have an opportunity to read and

14  discuss that plea with your lawyer before you signed it?

15  THE DEFENDANT:  Yes, sir.

16  THE COURT:  Has anyone made any promise or assurance

17  to you that is not in that petition to enter a plea of guilty

18  in order to persuade you to sign it?

19  THE DEFENDANT:  No, Your Honor.

20  THE COURT:  Has anyone made any promise or assurance

21  to you in order to persuade you to plead guilty?

22  THE DEFENDANT:  No, Your Honor.

23  THE COURT:  Has anyone threatened you in any way in

24  order to persuade you to plead guilty?

25  THE DEFENDANT:  No, sir.

1          THE COURT:  Are you pleading guilty today of your

2  own free will and because you are, in fact, guilty?

3          THE DEFENDANT:  Yes, sir, I am.

4          THE COURT:  All right.  We are going to review some

5  of these terms more in depth.  So in your petition, you

6  propose to plead guilty to Counts 1 and 2 of the indictment;

7  and that charges you with possession of a firearm by a

8  convicted felon, in violation of Title 18 United States Code

9  Section 922(g)(1).  So those are contained in the indictment,

10  Count 1 and Count 2.  Do you understand that?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Now, each of those offenses charged in

13  Counts 1 and Count 2 is punishable by a maximum sentence of up

14  to ten years' imprisonment, up to a 250,000-dollar fine, and

15  up to three years of supervised release following any term of

16  imprisonment.  Do you see that?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Do you understand that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Now, as I talked about earlier today --

21  you and I discussed it -- that if you were to not plead guilty

22  today, which is your absolute choice, and this were to go to

23  trial, the government would have to prove certain things

24  against you beyond a reasonable doubt.

25          Specifically, to sustain the offense charged in both

Count 1 and Count 2 to which you propose to plead guilty, the government would have to prove beyond a reasonable doubt, one, that you knowingly possessed a firearm; two, that prior to the date of possession, the firearm had been shipped or transported in interstate or foreign commerce; three, that prior to the date of possession, you had been convicted of a crime that was punishable by a term of imprisonment of more than one year; and four, that you knew that you had been convicted of a crime punishable by imprisonment for more than one year.  Has that all been explained to you?

THE DEFENDANT:  Yes, sir, it has.

THE COURT:  Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Do you understand that there's nothing in there that they would have to prove at trial with regard to that firearm being stolen?  Do you understand that?  That wasn't one of those elements?

THE DEFENDANT:  Yes, sir.

THE COURT:  So what would happen is they would prove those elements -- or if they prove those elements and you were found guilty, then we would be back here for sentencing; and it would be me again who would be determining whether or not that firearm was stolen.  Does that make sense?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, the petition does not talk about

1  forfeiture.  However, the indictment provides, to which you

2  propose to plead guilty to -- provides that if convicted of

3  the offense set forth in the indictment, the defendant shall

4  forfeit to the United States any firearm or ammunition

5  involved in or used in the offense; and it specifically

6  identifies a Smith and Wesson .40 caliber semi-automatic

7  handgun and a Walther .22 caliber semi-automatic handgun.  Do

8  you understand that?

9        THE DEFENDANT:  Yes, sir.

10        THE COURT:  Do you understand you would be

11  forfeiting those?

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  Now, the government has filed at ECF-45

14  a factual basis; and that was just filed.  So have you

15  reviewed that?

16        THE DEFENDANT:  Yes, sir, I have.

17        THE COURT:  As I said, this was just filed

18  yesterday; and so I don't know how much time you need to go

19  over this, but take as little or as much time as you need; and

20  then when you're ready, I'm going to ask you if all those

21  facts are true.

22        THE DEFENDANT:  Yes, sir.  To my knowledge,

23  everything is true.

24        THE COURT:  All right.  So you've had enough time to

25  look at all that?

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  And those facts are true?

3           THE DEFENDANT:  Yes, sir.

4           THE COURT:  Okay.  Now, the federal sentencing

5   guidelines provide an advisory guidelines range for

6   sentencing.  Have you discussed the federal sentencing

7   guidelines with Mr. Borland and how they may apply in your

8   case?

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  Do you understand that the Court has the

11  authority in some circumstances to depart upward or downward

12  from the advisory guidelines range and will also examine other

13  statutory sentencing factors set forth in 18 USC Section

14  3553(a), which is the governing law; and that may result in

15  the imposition of a sentence that is either greater or lesser

16  than the advisory guideline sentence?

17          THE DEFENDANT:  Yes, sir.  I understand.

18          THE COURT:  Now, when you first appeared in court in

19  this matter, you were advised of certain rights that you have,

20  rights that all defendants have.  I'm going to go over those

21  with you again; and then I'm going to let you know that by

22  pleading guilty, you waive those rights.

23          So you have the right to plead not guilty, as you

24  and I have already discussed, to any offense charged against

25  you and to maintain that plea.  If you were to plead not

1  guilty and persist in that plea, you would then have the right

2  to a public and speedy trial by jury.  At trial, you would be

3  presumed to be innocent; and the government would have to

4  prove your guilt beyond a reasonable doubt.  You would have

5  the right to the assistance of counsel for your defense in

6  this matter, appointed by the Court if necessary, at trial and

7  at every other stage of the proceeding.

8          You have the right to see and hear all the witnesses

9  and have them cross-examined in your defense.  You have the

10  right to decline to testify at trial.  On the other hand, you

11  also have the right to voluntarily choose to testify in your

12  own defense.

13          You have no obligation to present any evidence at

14  trial; but if you wanted to, you would have the right to use

15  the Court's subpoena power to require witnesses to present

16  evidence in your defense.  If you decided not to testify or

17  put on any evidence, these decisions cannot be used against

18  you; and I would instruct the jury they could not consider

19  those decisions in reaching their verdict.

20          Now, by pleading guilty, as you and I have

21  discussed, you give up those rights.  So do you understand

22  that by entering a plea of guilty, if that plea is accepted by

23  the Court, there will be no trial; and you will have waived or

24  given up your right to a trial, as well as all those other

25  rights associated with the trial as I've just gone over them

1 with you?

2        THE DEFENDANT:  Yes, sir.  I understand.

3        THE COURT:  I mentioned earlier that a term of

4 supervised release is among the potential penalties for the

5 offense to which you propose to plead guilty.  Do you

6 understand that if you violate the conditions of supervised

7 release, you can be given additional time in prison?

8        THE DEFENDANT:  Yes, sir.

9        THE COURT:  You also understand that in the federal

10 criminal justice system, parole has been abolished; that if

11 you are sentenced to prison, you will not be released on

12 parole?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  Do you understand that the maximum

15 good-time credit you can earn is 15 percent of your sentence?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  Do you understand that the offenses to

18 which you are proposing to plead guilty are felony offenses;

19 that if your pleas are accepted, you will be adjudged guilty

20 of those offenses; and that such adjudication may deprive you

21 of certain valuable civil rights, such as the right to vote,

22 the right to hold public office, the right to serve on a jury,

23 or the right to possess a firearm of any type?

24        THE DEFENDANT:  Yes, sir.

25        THE COURT:  Do you understand all those possible

1  consequences of your pleas and your -- as I've just gone over

2  them with you?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Do you have any questions for me?

5          THE DEFENDANT:  No, sir.

6          THE COURT:  Any questions for Mr. Borland?

7          THE DEFENDANT:  No, sir.

8          THE COURT:  Mr. Borland, do you know of any reason

9  that Mr. Modglin would not be able to enter a knowing and

10  voluntary plea of guilty?

11          MR. BORLAND:  No, Your Honor.

12          THE COURT:  Is there any additional advice the Court

13  should give him under Rule 11?

14          MR. BORLAND:  No, Your Honor.

15          THE COURT:  All right.  Mr. Modglin, this is now the

16  point where the decision is up to you.  So I ask you how do

17  you plead to the charge of possession of a firearm by a

18  convicted felon, as alleged in Count 1 of the indictment,

19  guilty or not guilty?

20          THE DEFENDANT:  Guilty, sir.

21          THE COURT:  And Mr. Modglin, how do you now plead to

22  the charge of possession of a firearm by a convicted felon, as

23  alleged in Count 2 of the indictment, guilty or not guilty?

24          THE DEFENDANT:  Guilty, sir.

25          THE COURT:  All right.  It is the finding of the

Court in the case of United States of America versus Brandon

Modglin that the defendant is fully competent and capable of

entering an informed plea, that the defendant is aware of the

nature of the charge and the consequences of the plea, and

that his pleas of guilty are knowing and voluntary pleas

supported by an independent basis in fact, containing each of

the essential elements of the offense.  His pleas are,

therefore, accepted; and the defendant is now adjudged guilty

of the offenses charged in Counts 1 and Count 2 of the

indictment.

And I understand the parties are prepared to move

directly to sentencing; is that right, Mr. Morris?

MR. MORRIS:  Yes, Your Honor.

THE COURT:  Mr. Borland?

MR. BORLAND:  Yes, Your Honor.

THE COURT:  I guess -- yes, Mr. Morris?

MR. MORRIS:  I've been trying to research an issue

with probation.  I brought the issue up before we started.  I

am just needing maybe like a few minutes prior to us going

into the sentencing because it could impact the direction of

the sentencing hearing.

THE COURT:  Okay.  We'll take a short recess.  Just

let me know when you're ready.

MR. MORRIS:  Thank you.

COURTROOM DEPUTY:  All rise.

1          *(A recess was taken.)*

2          THE COURT:  We are back on the record in U.S. versus

3     Brandon Modglin, which is Cause 1:19-cr-74; and what we're

4     going to do now, having found Mr. Modglin guilty and the

5     parties being in agreement, we're going to proceed to

6     sentencing now, Mr. Modglin.  We're going to go over your

7     presentence investigation report, which appears at ECF-42.

8     We'll talk about the advisory guidelines calculations, get

9     statements and/or arguments from the parties; and then I'll

10    pronounce sentence.

11         Any questions about that?

12         THE DEFENDANT:  No, sir, Your Honor.

13         THE COURT:  So I have reviewed that PSR that appears

14    at ECF-42, as well as the defendant's submission of letters in

15    support at ECF-44.

16         Now, it seems to me that I have just one of the

17    letters.  So I don't know if that got cut off or -- it's a

18    very long letter, and I think it's from maybe Amber Harlan.  I

19    don't know.

20         MR. MORRIS:  The second letter is the 10th page.

21         MR. BORLAND:  The very last page is a typed letter

22    from Mary Page.

23         THE COURT:  Oh, okay.  Never mind.  I have reviewed

24    the other letter.

25         Any additional documents for the Court today from

1  the government?

2          MR. MORRIS:  No, Your Honor.

3          THE COURT:  You've got some certificates maybe?

4          MR. BORLAND:  I have some certificates that

5  Mr. Modglin just handed me, Judge.

6          THE COURT:  Okay.  You can give those to Mr. Rogers.

7          MR. BORLAND:  One is from February, and one is from

8  March.  I'm sorry for the lateness.  Mr. Modglin just brought

9  those from the jail this morning, Judge.

10          THE COURT:  Okay.  Thank you.

11          Any objections to those, Mr. Morris?

12          MR. MORRIS:  No, Your Honor.

13          MR. BORLAND:  Nothing beyond those documents.

14          THE COURT:  All right.  And Mr. Borland, have you

15  and Mr. Modglin read and discussed the presentence report?

16          MR. BORLAND:  We have, Your Honor, all two or three

17  different versions of it.

18          THE COURT:  And were you afforded an opportunity to

19  provide information to the PSR?

20          MR. BORLAND:  Yes.

21          THE COURT:  And you had one objection to the PSR?

22          MR. BORLAND:  Yes, Your Honor.

23          THE COURT:  Which had to do with dealing with meth

24  under -- that should not be used to increase his base offense

25  level under 2K2.1(a)(2); and the probation officer has

1  provided a response. Are you satisfied with that response?

2       MR. BORLAND: Yes, Judge. We would obviously want

3  to maintain that objection, but we do understand that

4  response.

5       THE COURT: In light of *Ruth* -- the subsequent case

6  of *U.S. v Ruth*, that the binding Seventh Circuit would kind of

7  be against you; but maybe that might be resolved by the

8  Supreme Court; is that it?

9       MR. BORLAND: That's our hope, Judge, because there

10  is a split among the circuits on that very issue. So we do

11  want to preserve that, but we do believe that the objection

12  that's in the paper is sufficient to do so.

13       THE COURT: All right. Thank you. Any other

14  objections at this time from the government?

15       MR. MORRIS: No, Your Honor. We will stand by the

16  probation officer's response that *Ruth* is controlling as to

17  this issue.

18       THE COURT: But any other objections from the

19  government to the PSR of any type?

20       MR. MORRIS: Yes, Your Honor.

21       THE COURT: Okay.

22       MR. MORRIS: I would note that the United States

23  believes based upon the convictions of this particular

24  defendant that he is an armed career criminal; and I base that

25  off of --

1        THE COURT:  Why don't you hold that.  I just want to
2   get the objections now.  We'll talk about them later.  Is that
3   the sole objection?
4        MR. MORRIS:  Yes, Your Honor.
5        THE COURT:  Any other objections from the defendant?
6        MR. BORLAND:  No, Your Honor.
7        THE COURT:  Let's talk about the proposed conditions
8   of supervised release found in the PSR.
9        Have you reviewed those carefully with Mr. Modglin?
10       MR. BORLAND:  Yes, we have; and I believe he's had
11  adequate time to review those as well, Your Honor.  We do find
12  them to all be appropriate and have no objection to any of
13  them.
14       THE COURT:  All right.
15       Mr. Modglin, have you reviewed those proposed
16  conditions?
17       THE DEFENDANT:  Yes, sir.
18       THE COURT:  Now, the probation officer has included
19  the reasons why he's recommending those conditions; and I
20  agree with those reasons.  Do you understand them?
21       THE DEFENDANT:  Yes, sir.
22       THE COURT:  If you believe that you do understand
23  those reasons -- or those conditions and why they're being
24  imposed, you can waive reading of the conditions of supervised
25  release as I pronounce sentence.  So you have the right to

have me read each of those to you as I pronounce sentence; or

again, if you believe that you do understand them and why

they're being imposed, you can waive that reading.

Do you wish for me to read those to you as I

pronounce sentence or do you waive reading?

THE DEFENDANT:  I waive reading, Your Honor.

THE COURT:  Very well.  I find the defendant has

waived formal reading, and I accept the waiver.

And so we have -- although Mr. Borland preserves his

objection with respect to the methamphetamine charge, he's

acknowledged that *Ruth* is controlling law in this circuit.  So

I don't need to reach that issue anymore; but let's turn to

Mr. Morris's objection, which is that Mr. Modglin -- or the

Court should find that Mr. Modglin is an armed career

criminal.

You may proceed, Mr. Morris.

MR. MORRIS:  Thank you, Your Honor.  The United

States believes that this defendant is an armed career

criminal based upon the three offenses, paragraph 32, 37, and

41.  I'll take them in part.

Paragraph 32 in the presentence report is a 2003

conviction, felony burglary.  That's charge three in that

particular instance, and I'll come back.

Paragraph 37, which is on page 9 of the report, the

same -- being the same.  It is a battery conviction, a C

felony battery conviction in Marion County, under the laws of the state of Indiana, the conviction in 2009.

And then paragraph 41, which is on page 11, is a strangulation conviction in 2017.

And it is our position that these three felonies combined do qualify as an armed career criminal under 924(e), which states that either the defendant must have three convictions either of a violent crime -- sorry -- a crime of violence or any type of drug conviction, specifically in this case, which would have been the dealing in methamphetamine case; but we're not bringing that because that falls out due to the *De La Torre* case.

However, we have three in which this -- which do qualify, in our opinion, as armed career criminal predicate felonies under the statute.

Burglary would actually fall up under the second prong of the subsection, which allows for certain delineated offenses, which include burglary in that particular case. So that's on the first one under paragraph 32.

THE COURT: Let me ask you a question first, Mr. Morris. So --

Well, let me first ask Mr. Harrold. Under the armed -- if Mr. Modglin was an armed career criminal, how would that change the penalties in this case, if at all?

PROBATION OFFICER HARROLD: Your Honor, I'm in the

process of gathering that information now. I can tell you

that if he is found eligible for ACCA, that would make him a

mandatory minimum of 15 years; and I can get the terms of

supervised release and fine penalties here shortly for you.

THE COURT: I think the mandatory minimum of 15

years is fine.

So Mr. Morris, I guess I have a question, which is

we just took a plea from Mr. Modglin, where he thought that he

was facing no more than ten years of imprisonment; and now

you're seeking no less than 15 years after he's pled.

And even before we started this morning, we had a

meeting of the parties; and that was not raised with the Court

in any way. It was certainly not raised at all during his

plea. How can his plea be knowing and voluntary without

knowing that he's walking into a mandatory minimum of 15

years?

MR. MORRIS: Your Honor, at the outset, we did not

discuss that within the chambers hearing that we had. We were

discussing another issue.

THE COURT: Sure.

MR. MORRIS: I did not use that time to bring this

issue up.

THE COURT: That's why I brought it up. Why not?

MR. MORRIS: Correct. But prior to the in-chambers

conference, prior to the start of this particular hearing, I

1   did bring the issue up with defense counsel and United States

2   probation to discuss the issue related to the paragraph 32

3   burglary conviction from 2003.

4           THE COURT:  When you say "this particular hearing,"

5   you're talking about the plea hearing or the sentencing

6   hearing?

7           MR. MORRIS:  The plea hearing, Your Honor -- well,

8   if we've broken them up into two, you are correct, before the

9   plea hearing, Your Honor.

10          THE COURT:  Before the plea hearing.  So before nine

11   o'clock this morning?

12          MR. MORRIS:  Yes.

13          THE COURT:  This morning?  Okay.

14          MR. MORRIS:  I'm not sure what your question was.

15          THE COURT:  So my question is how can it be a

16   knowing and voluntary plea if the defendant thought he was

17   facing a maximum of ten years; and now after he's pled, he's

18   facing a minimum of 15 years?  How can that be a knowing and

19   voluntary plea?

20          MR. MORRIS:  I don't disagree with you about it not

21   being a knowing and voluntary plea.

22          The issue that I was bringing up is that when I

23   first came into -- right before the hearing, I did speak with

24   defense counsel and United States Probation about the issue

25   and that it came to me -- or I just found this morning -- and

1  it was important for me to bring up --

2         THE COURT:  Well, if you agree with me that it can't

3  be a knowing and voluntary plea, why didn't you bring it up on

4  the record before he pled guilty?  I don't understand.

5         MR. MORRIS:  So when we were discussing this case --

6  well, discussing not the case -- the issue as it pertains to

7  the burglary conviction from 2003, defense counsel raised that

8  *De La Torre* controls over this issue; and it wouldn't apply.

9         And we discussed briefly about the issue, and I even

10 discussed it more; but the pressing issue was to get into

11 chambers and discuss this issue -- the issue that we discussed

12 in chambers, separate and aside from this one.

13        When we came back out, I finished talking to him

14 during the plea colloquy because I still had some questions

15 that needed to be explored.  And while I was doing that, I

16 also ensured that *De La Torre* had nothing to do with this

17 particular issue, which would not control and dismiss the

18 issue; and that is why I was communicating with probation in

19 order to make sure that I had proper information before I

20 brought it before the Court.

21        And so this was happening simultaneously, and I know

22 Your Honor did observe me stepping back to speak with

23 probation about it.

24        THE COURT:  Right after he pled guilty was when you

25 asked for a recess.  Don't you think that would have been

1  important for him to know before he pled guilty, even if you

2  didn't have all the information?  Don't you think that that

3  would have been important to say, "We need a recess or I need

4  to raise this issue with the Court"?

5           MR. MORRIS:  I'm not sure what you're specifically

6  asking.

7           THE COURT:  Well, how can he knowingly and

8  voluntarily plead guilty if you knew in the back of your mind

9  that he may be facing a minimum of 15 years?

10          MR. MORRIS:  Well, as I wanted to get the proper

11  information before the Court, this was happening

12  simultaneously as you were proceeding forward.  Literally,

13  right when you were finishing, that's when I received the

14  information that I needed; and I did immediately bring it to

15  the Court's attention.

16          It did happen after the plea was taken, but it

17  doesn't negate the issue that I wanted to bring up to the

18  Court's attention.  The point is I still brought it up to the

19  Court as an issue that I did want to discuss with Your Honor.

20          THE COURT:  Well, we'll see how this proceeds; but

21  you understand that depending on how I find -- and I'll have

22  to wait to hear what you say -- that I'm going to have to

23  allow him to withdraw his plea?

24          You agreed with me it's not a knowing and voluntary

25  plea if he didn't know what the penalties were, right?

1    MR. MORRIS:  If this issue does, you know, turn on

2 that, it does raise an issue as to the penalties; but I will

3 also say that the defense counsel was aware of potential

4 penalties for this case.  That is clear.  And the defense

5 counsel was aware that the defendant could be charged as an

6 armed career criminal.

7    Whether it changed the facts of what happened with

8 *De La Torre* and how we arrived at the plea agreement, the

9 removal of a plea agreement, his petition to enter a plea, and

10 then the report done by probation and us arriving here, yes,

11 those facts do change things as to what he was entering to

12 enter a guilty plea; but he was not entering based upon a

13 sentence.  He doesn't have a plea agreement here.

14    THE COURT:  I'm dumbfounded.

15    MR. MORRIS:  The first of --

16    THE COURT:  Let me finish, Mr. Morris.

17    MR. MORRIS:  Yes, Your Honor.

18    THE COURT:  I'm dumbfounded.  First of all, it

19 doesn't make any difference what he knows.  It's what I know.

20 I'm the one that's taking the plea, and I'm the one that's

21 assuring that he is making a knowing and voluntary plea.

22    And you heard me pronounce that I find that he's

23 made a knowing and voluntary plea.  Well, that's not the case.

24 You've got to know under the law he has got to be advised by

25 me and know what the potential penalties he faces are, right,

1  regardless of whether there's a plea agreement or not?  Isn't

2  that correct?

3          MR. MORRIS:  I disagree.

4          THE COURT:  Which part do you disagree with?

5          MR. MORRIS:  I think we're going to be going on the

6  semantics -- we just are at a disagreement on that.

7          THE COURT:  Which part?

8          MR. MORRIS:  You want me to acknowledge the

9  defendant was not aware of any enhancement penalties during

10 his plea.  I agree with that.  He was not aware during this

11 plea hearing -- well, the plea hearing that took place today

12 that there was a potential of a increase.

13         However, that can be corrected.  He can be given the

14 opportunity with this information, if he should choose to

15 withdraw -- if Your Honor should choose it; but it can also be

16 corrected as well by notifying the defendant of -- here are

17 potential penalties based upon what this issue brings to

18 light.  It does not remove the fact that he has the potential

19 to be charged with it.

20         Yes, it does take away that he may want to withdraw

21 his plea; and if that is his desire, Your Honor --

22         THE COURT:  Based on what?  Why would he be able to

23 withdraw?

24         MR. MORRIS:  The information -- as far as like what

25 he could be facing penalty wise.

1          THE COURT:  Why would he be able to withdraw his

2  plea?

3          MR. MORRIS:  I'm saying if Your Honor allowed.

4          THE COURT:  But why would I allow that?

5          MR. MORRIS:  I just stated why he would be allowed.

6  I think we're kind of, like, now going back to the point of

7  what your original question was.  The original question

8  focused on whether the defendant should be allowed or was he

9  giving a knowing and voluntarily [sic] plea based upon this

10  issue that I'm raising, essentially.

11          And based upon this information with the enhancement

12  or the enhancement penalties of it, no, he was not given that

13  information during the plea colloquy.

14          Now --

15          THE COURT:  Nor was I.

16          MR. MORRIS:  So again, in bringing that issue up to

17  the Court, I did bring it up.

18          THE COURT:  During the plea?

19          MR. MORRIS:  I made it clear that I did not get the

20  information cleared until the end of that plea; and as it was

21  simultaneously happening -- and if Your Honor noticed me

22  moving back and forth, and by the time that I turned around

23  and got the information and verified it as to what I needed to

24  look at, I did bring it to the Court's attention.

25          The issue is the timeliness of it, and I don't

1  disagree that there is a huge issue as far as the timeliness

2  of it; but I'm bringing it to the Court's attention because I

3  feel like it is my duty, and it is what I wanted to bring to

4  the Court's attention.

5          Now, we wouldn't be having the issue or having this

6  discussion if I sat idly by and didn't say anything or we

7  wouldn't have had a conversation in chambers earlier this

8  morning prior to the plea if defense counsel didn't say

9  anything.

10         He felt that -- and he did what he felt was his duty

11  to do and the same that I'm feeling as far as for this case

12  and with this defendant, I feel it is my duty to bring that to

13  the Court's attention, regardless of the timeliness of it.

14         Now, it can be corrected through other means, but it

15  doesn't mean that I don't have to -- or I shouldn't bring this

16  to the attention.

17             THE COURT:  Have I suggested that at all in any way?

18             MR. MORRIS:  No.

19             THE COURT:  Well, then why are you bringing it up?

20             MR. MORRIS:  Because I'm making my argument to the

21  Court as to -- you asked me a series of questions, and so this

22  is me in response.  It's not me accusing the Court of

23  anything.  It's just me making my stance as to why I made that

24  particular decision to bring it to the Court's attention.

25             THE COURT:  The question that I had was, "Do you

1 think that he made a knowing and voluntary plea, which

2 requires him to know the nature of the charge and the

3 consequences of the plea?"  I specifically asked you if you

4 had any objections?  You've raised them.  I'm just saying how

5 does that make his plea a knowing and voluntary plea?

6     Now, we'll see how this plays out.  I need to hear

7 what your arguments are.  I need to hear what Mr. Borland's

8 arguments are, but I think that you and I are in agreement.

9 You say it could be corrected, and that's the correction that

10 would have to be made is that he needs to have the opportunity

11 to withdraw his plea based on now a new nature of the

12 charge -- or excuse me -- or the consequences of the plea.

13     So all right.  Continue.

14     MR. MORRIS:  I finished off with discussing

15 paragraph 32, I believe.

16     THE COURT:  So let's talk about paragraph 32.

17 Mr. Borland, would you like to -- we're going to take these

18 one at a time, Mr. Morris, because I think that would be

19 easier to do.

20     MR. BORLAND:  Thank you, Your Honor.

21     With regard to paragraph 32, Judge, I'm not aware of

22 any evidence that's been presented by the government to

23 establish the details of this offense.  This was a Class D

24 burglary attempt out of Greenville, Tennessee.  To the extent

25 that the government is relying upon the facts that are

1 presented in the presentence report to establish the details

2 of this, the first sentence is the most telling. "The

3 circumstances for this case are not available."

4     It is my understanding that under the Tennessee law

5 and the definition of burglary, there are things that would

6 not qualify as ACCA predicates that are called "burglary" in

7 the state of Tennessee; stealing things from a vehicle, for

8 example.

9     Therefore, unless or until the government is to

10 present evidence here in court to establish the details of

11 that offense, something more than just a narrative, something

12 more -- frankly, it would have to be more than even a probable

13 cause affidavit. It would have to be a judgment of conviction

14 or a factual basis that was sworn to in court before that, I

15 believe, could be presented as proof of that ACCA predicate;

16 and I do not believe that's been done here today. I think

17 merely stating the statute and date of conviction is

18 insufficient, Your Honor, because there are things under that

19 statute that don't qualify.

20     THE COURT: Do you think that this is a felony just

21 because it's over -- or perhaps is a felony because it's over

22 $500?

23     MR. BORLAND: Could be, Judge. We really haven't

24 had much time to research that. This is something -- perhaps,

25 if we had known about this before today, we would have better

1   answers for you.

2           THE COURT:  That's a different issue, too.

3           Okay.  Mr. Harrold, any thoughts on this from the

4   probation office?

5           PROBATION OFFICER HARROLD:  Judge, I'm kind of

6   trying to piece together some of this.  I received a message

7   from our guideline specialist regarding this burglary

8   conviction; and it's his stance that after researching into

9   Tennessee statute, that this burglary conviction and the

10  statute he was convicted under would not constitute as a

11  violent crime for ACCA purposes.

12          THE COURT:  Why is that?

13          Just for the record, we took a recess.  We spoke

14  with the specialist; and so over the last hour or so, he's

15  been looking into these issues, right?

16          PROBATION OFFICER HARROLD:  Correct, Judge.

17          THE COURT:  So go ahead.

18          PROBATION OFFICER HARROLD:  So the message I

19  received from United States Probation Officer Greg Combs out

20  of the Evansville, Indiana, office, our guideline specialist,

21  and the reasons he stated he did not believe it was a violent

22  felony was Tennessee statute -- the statute he was convicted

23  under does not qualify as what they call generic burglary,

24  which is used -- is the term used to consider a burglary a

25  crime of violence; and that is if -- the offense is a violent

1  felony only if committed in a building or an enclosed space,

2  which is what they consider generic burglary as a violent

3  crime.

4           THE COURT:  Meaning who, Tennessee or --

5           PROBATION OFFICER HARROLD:  Tennessee, not in a boat

6  or motor vehicle.

7           THE COURT:  And this was a boat or a motor vehicle?

8           PROBATION OFFICER HARROLD:  Well, we're unsure

9  because we don't have the facts of that case, just simply the

10  judgment; but based on the statute he was charged in, it does

11  appear that it was not a residence or dwelling but more of

12  a -- I believe he stated a freight -- some type of freight --

13          THE COURT:  Freight car, vehicle, something like

14  that.  So it specifically mentions these things but not a

15  building; is that right?

16          PROBATION OFFICER HARROLD:  Correct.

17          THE COURT:  Do you have anything -- I'm sorry.  Go

18  ahead.  And what?

19          PROBATION OFFICER HARROLD:  Sorry, Judge. I was just

20  taking one last look at it.  That's kind of the gist of it

21  that I've gathered so far from what he sent me; but again, our

22  guideline specialist does not believe that it fits as a

23  violent crime for ACCA purposes.

24          THE COURT:  All right.  Mr. Morris, do you have

25  anything to the contrary that shows that this was committed in

a building or a structure other than a vehicle?

MR. MORRIS:  No, and that was sort of the -- part of the question or inquiry as it pertains to the burglary when I came in this morning was whether, one, it qualifies as a predicate offense; and two, would it actually -- based upon information that we have researched is would it qualify as an armed career criminal on the elements of the offense.  So that is what spurred the discussion, particularly with burglary and the battery issue.

THE COURT:  So you've heard now from Officer Harrold, as well as specialist Greg Combs, that they do not think based on this statute that it would be a predicate.

And so what I'm asking is if you either agree or disagree with that; and if you disagree, if you have any evidence to give to the Court today?

MR. MORRIS:  No.  I'll agree with that -- with what probation has been able to research on the issue.  Thank you for that, and thank you to him for researching it.

With that being the case, then that would remove the argument.

THE COURT:  So we don't even need to look at the other two; is that right?

MR. MORRIS:  No, Your Honor.

THE COURT:  So it's -- I guess the objection is denied as moot then based on -- or do you just want to

1  withdraw it?

2          MR. MORRIS:  I can withdraw the objection.

3          THE COURT:  So it's withdrawn.  Any other objections

4  from either side?

5          Okay.  So the Court accepts the presentence report

6  as its findings of fact and accepts the presentence report for

7  the record under seal.  In the event of any appeal, counsel on

8  appeal will have access to the sealed report but not to the

9  recommendation portion, which shall remain confidential.

10          Now, Mr. Morris, the PSR contemplates a motion for a

11  further one-level reduction for timely acceptance of

12  responsibility under Guideline Section 3E1.1(b).  Would you

13  care to make that motion now?

14          MR. MORRIS:  I do.  The United States moves -- or

15  asks the Court to respectfully to -- for the additional

16  one-level decrease for acceptance of responsibility.  We do

17  ask the Court to allow for that for this defendant.

18          THE COURT:  Okay.  That motion is granted.  The

19  following then are the Court's conclusions as to the

20  appropriate offense level and criminal history category:

21          The Court finds that the base offense level under

22  Guideline Section 2K2.1(a)(2) is 24.  Two points are added

23  under Guideline Section 2K2.1(b)(4)(A) because one of the

24  firearms was stolen.  Under Guideline Section 3E1.1(a), the

25  offense level is reduced by two because the defendant has

1  accepted responsibility for the offense; and under Guideline

2  Section 3E1.1(b), the offense level is reduced by an

3  additional level, through the Court's granting of the

4  government's motion for acceptance of responsibility.

5         Therefore, the Court finds that the total offense

6  level is 23.  The applicable criminal history category is VI.

7  This yields a guidelines range of 92 to 115 months'

8  imprisonment, a fine of 20,000 to $200,000, a term of

9  supervised release of one to three years per count, and a

10  special assessment of $200.

11         Mr. Morris, do you have any objection or response to

12  the Court's calculation as to the offense level or criminal

13  history category?

14         MR. MORRIS:  No, Your Honor.

15         THE COURT:  Mr. Borland, any objection?

16         MR. BORLAND:  No, except for our previous objection

17  under paragraph 16, which would lower the base offense level,

18  Your Honor.

19         THE COURT:  All right.  Subject to your ongoing

20  objection there.

21         So Mr. Borland, would you and/or Mr. Modglin care to

22  make a statement today?

23         MR. BORLAND:  Yes, Your Honor.  I've spoken with

24  Mr. Modglin.  He has written out his statement.  Despite my

25  instructions to keep it brief, he was unable to do so; but

1    when I read it, honestly, I'm not sure what he could have left

2    out.  So I would like to have him go ahead and read his

3    statement first.

4            THE COURT:  Mr. Modglin, please do so.  Please take

5    your time so that the court reporter can keep up with you,

6    okay?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  People have a tendency -- and we already

9    discussed this -- to be nervous, and so that makes you kind of

10   speed up, especially if it's written.  So just take your time.

11           MR. BORLAND:  Judge, can he pull his mask down while

12   he gives that statement?

13           THE COURT:  Yes, he may.

14           THE DEFENDANT:  I'm all right.

15           Your Honor, I'm sorry for having to bring everyone

16   out during the pandemic.  My poor decisions have affected

17   everyone in the process.  I apologize.

18           These past 20 months have been a real eye-opener for

19   me.  You've seen my criminal record, and you know I've made

20   some bad choices in my past.  Some I'm most certainly not

21   proud of.  I can honestly say that after 37 years and being

22   federally indicted, I finally get it.

23           I could sit here and tell you how sorry I am, which

24   I am; but sorry doesn't cut it, and I don't want you to think

25   that I'm trying to justify anything, because as a man, I know

1  right from wrong; and I admit I was wrong.

2          I know the root of my problems comes from drug use.

3  They're the reason I stand before you today.  My whole life

4  I've always wanted to fit in, be cool, be accepted; and by

5  that being so, I was easily influenced.

6          As a child and even being a teenager and young

7  adult, I was abused, sexually by a stepfather as a child,

8  emotionally and physically by a father my whole life, someone

9  I still to this day pray for a relationship with.  Why, I'm

10 not so sure.  I was a young man with no direction and no clue

11 what manhood was about.

12         I grew up to be someone with not much confidence in

13 myself or my abilities.  I started using drugs for instant

14 gratification to escape reality.  Drugs took my past and my

15 pain away.  Before I knew it, I had to have drugs to cope with

16 everyday life.  I know there's no formula for pain, nor is

17 there any formula to explain pain.  It's no excuse, I know.

18 I'm just trying to give an insight as to why or where I went

19 wrong.

20         My mother and my kids' mother, both dear to me,

21 passed away from drug overdose.  I've lost both my

22 grandmothers, my kids' mother, cousins and friends during my

23 incarceration; and I know for a hundred percent certain this

24 is not the life I want to continue to live.

25         I've missed out on so much life has had to offer,

and I'm truly fed up with missing out.  I want the maximum

potential that life has to offer me, and I'm committed to

getting it upon my release.

THE COURT:  How is that?

THE DEFENDANT:  By taking advantage of -- it goes on

to say I want to take advantage of any programs and being drug

free and live a sober life.

THE COURT:  Okay.  Go ahead.

THE DEFENDANT:  I'm sorry.  I want to get into any

program that will help me grow as a man, especially a drug

program.  I would like to further my education so that I can

come home with the skills and mindset to learn a trade and

have a career.  The thought of owning my own home, coming home

every evening to a family that loves me, not having to worry

about looking over my shoulder, knowing I've earned an honest

day's pay is very appealing to me.  I want and will experience

that in my future.

My goal is to obtain a barber's license and a degree

in business management; and my dream is to own a barber

shop/salon with my soon-to-be wife in Atlanta, Georgia.

I don't want to be remembered as a drug addict, a

thief, and a liar, but as a man who was loved, trusted, and

well-respected.  I would like to be known as someone who made

a contribution and made the world a better place.

My grandfather, Mr. Robert Cuble, a devoted

ranking -- high-ranking military officer, whom I love very much, once told me I have to learn to respect myself before I can ever think about getting it from others. Today, I can say honestly I'm learning to respect myself.

These past 20 months have held me being on a path, becoming a better man; and Your Honor, I can tell you, honestly, I finally get it. I get the life I've been living was wrong. It took me long enough; but I realize the important things in life consist of family and true, sober happiness.

I understand it's never easy taking a man's liberty, but I stand before you today holding myself accountable and accepting responsibility for my actions; and if you can find it in your heart any leniency, I know myself and, most importantly, my family would greatly appreciate it. Thank you for the opportunity, sir.

THE COURT: What was it about your life that was wrong -- that you were living that was wrong that you get was wrong?

THE DEFENDANT: Honestly, I think it was a combination between the drugs and the mindset, the people that I put myself around, and just the choices I was making every day.

THE COURT: What about this domestic violence? You've got some of that; too much of that.

1          THE DEFENDANT:  I do.

2          THE COURT:  Any is too much.  You've got a lot of

3 that.

4          THE DEFENDANT:  I'm not proud of that, sir.

5          THE COURT:  Why is that?  Why the domestic violence?

6          THE DEFENDANT:  Honestly, drugs, jealousy, no

7 confidence.  I could sit here and tell you a million things.

8 I really can't explain it.  I know I feel terrible for it.  I

9 hate it.  I have to live with it every day.  It's bad when I

10 meet somebody and they look at my record and they see -- it's

11 bad.  I know.  But it's not somebody I am today.

12          THE COURT:  I think you said that nobody showed you

13 how to be a man.

14          THE DEFENDANT:  That's true.

15          THE COURT:  Did they have to show you that to know

16 that you don't beat up on women?

17          THE DEFENDANT:  No, sir.

18          THE COURT:  You said that you wanted to get a

19 business management degree.  It seems to me that someplace in

20 here it says you weren't even interested in completing your

21 GED.  Did I read that right?  What's the difference?

22          THE DEFENDANT:  Yeah.  I don't understand -- I

23 remember talking to Mr. Borland when I did my presentence; and

24 I'm not calling nobody a liar, but I don't remember saying

25 that.  I wouldn't say that.  I would love to further my

1 education, and I don't -- I don't remember saying that,

2 honestly.

3          THE COURT:  All right.  We talked about maybe it's

4 your state of mind at the time.  You're sober now, right?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  How does that feel?

7          THE DEFENDANT:  It feels great.

8          THE COURT:  Okay.  Please remember that.

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  All right.  Mr. Borland.

11          MR. BORLAND:  Thank you, Judge.

12          Judge, in this case -- I'll move over so I can see

13 you.

14          THE COURT:  No, I can see you fine.

15          MR. BORLAND:  The nature of the offense, he held

16 onto an object that's legal for you or I to hold onto, right?

17 It's a weird law.  There's really nothing unusual about this

18 particular set of facts.

19          If anything, there was no violence involved in what

20 he was doing.  He wasn't committing any other crime.  He

21 wasn't threatening to harm anybody with these weapons.  He was

22 passed out due to his drug addiction in a vehicle.

23          THE COURT:  So when you say "no other crime," it

24 seems to me he was maybe driving intoxicated or something?

25          MR. BORLAND:  He was sitting in a parked car.

1    THE COURT:  In the middle of the street, right?  In

2  front of the driveway?

3    MR. BORLAND:  In front of a driveway.

4    THE COURT:  Okay.  Go ahead.

5    MR. BORLAND:  So there's nothing -- it wasn't one of

6  these high-volume weapons.  They weren't automatic weapons.

7  There's nothing egregious about this particular version of the

8  offense.

9    Quite frankly, him getting caught doing this in the

10  long run is very likely to have saved his life, because I

11  cannot believe that the guy who got caught that day would have

12  been capable of writing the letter that he just read out loud.

13  I think that this -- this is an opportunity for him, Judge.

14  So that's the offense.  It is what it is.

15    Now, the characteristics of the offender, we've got

16  something to work with.  He's taken most of my argument away

17  from me because he very intelligently expressed his life.

18    I think there's three prongs to the characteristics

19  of Mr. Modglin that got him here today.  The first is when you

20  take a child and you abuse them and you abandon them and you

21  neglect them and abuse them in every possible way, this is

22  what you get.

23    Then when you take a child who also has mental

24  health issues and do that, you doubly get this.  And of

25  course, when you take a child who has mental health issues and

do these things to him, he's going to get addiction issues as
well.  Those three prongs landed him here today.

I would say that there's been an advantage to this
great COVID pause because it's given me quite a bit of time to
get to know Brandon Modglin.  We've had many, many
interactions, letters, meetings, videos where we've discussed
lots of things, some of which had nothing to do with the case.
We spent quite a bit of time at the beginning of the case when
he was in the Marion County Jail briefly talking about the
case and, more importantly, talking about who he is and how he
got here and how we're going to get him out of this.  So his
perspective has developed and been great.

He does seem, Judge, to get it.  I do think he is
one of these guys when you see he doesn't have a high school
diploma, he needs to get one because he's clearly intelligent
enough to do so; and he's certainly got potential.

I think that, Judge, when you look at those domestic
violence incidents, I think maybe I can give some insight into
it.

Brandon, I'm not trying to insult you or belittle
you; but I think we've got to try to get into why you got
here.

I think his mental health issues play a very, very
large part of that.  I think that he gets in stressful
situations or difficult situations and lashes out.  I'll have

1  to admit that I've been the recipient of some of those lashing

2  outs.  So I can see it.  I think when he gets frustrated or

3  feels trapped, I think that that is his reaction.  So I wasn't

4  there.  I don't know those relationships, but I can imagine

5  that that is something that has led to it, because we've

6  clearly taken the substances out of the equation over the past

7  year and a half.

8            So Judge, I think he needs to not just have

9  education.  He needs to deal with the substance abuse, for

10  sure; but I think those underlying mental health issues are

11  driving the bus on this; and I think he needs to do that.  I

12  think there was a self-medicating aspect to this that maybe he

13  doesn't even realize, going back to age 14, 15 when he's

14  smoking weed all of a sudden.  You can see how somebody with

15  some of these anxiety issues and all would be drawn to that;

16  but of course, as we know, as we see in this room every day,

17  that's the first step down a path that leads to this seat that

18  he's in today.

19            What are we going to do with Brandon?  Ninety-two to

20  115, I don't frankly, Judge, see how 115 gets him more help or

21  teaches him a bigger lesson than 92; and I think that's kind

22  of the operative question.

23            I think he is committed to change.  This is, again,

24  one of those letters -- I wish I could take credit for writing

25  that thing, and I didn't have anything to do with that at all.

The first time I saw that letter was today.

But this is a guy who gets it. He isn't just saying a couple of things, "I'm sorry" and mumbling. He looked you in the eye, Judge, and he said the right things.

Now, it's time for him to put that in motion; but he's going to get some time to do that. So I would suggest substance abuse. I would suggest job training. I would suggest education for him and, certainly, continuing to deal with the mental health issues, because I think that that's something that doesn't seem to have ever been effectively dealt with; and I think he understands that.

So, Judge, I'll leave it to the Court's discretion precisely the sentence; but I think those are the factors we need to be considering. Thank you.

THE COURT: All right. Thank you.

Mr. Morris?

MR. MORRIS: Through a review of the defendant's criminal history, one thing that just comes across to me is that nothing gets the point across to this defendant.

As it pertains to the offense conduct on February 19th of 2019, the defendant was asleep in a running car, two firearms on his person; a loaded firearm with ten live rounds of ammunition sat in his lap. That was a Smith and Wesson .40 caliber; and on his person, on his physical body was a Walther P22, a .22 caliber semi-automatic firearm;

1  two firearms, sitting in a car passed out, asleep.

2        When officers arrived, it could have went a lot of

3  different ways.  And I'm thankful that it ended peacefully,

4  you know, as he could have woke up abruptly, grabbed the

5  firearm.  That particular scenario is extremely dangerous,

6  coupled with his history and known history of violence.  This

7  was a scenario that could have gone wildly wrong.  And so I do

8  believe that this is one of those instances where it sets up

9  the backdrop for something bad to go wrong or something to go

10 extremely bad in this particular case.

11        We have -- the defendant has at least 15 arrests,

12 eight felony convictions, which we see start from -- these are

13 solely felony convictions.  He has criminal history prior to

14 that first felony conviction in 2003; but just looking from

15 2003, a burglary, where he may have served a year.  We move to

16 2007, where there's a fraud, where there was no time served.

17 We have a theft in 2009, possibly two years.  That was also --

18 that looks like a sentence that may have ran concurrently or

19 consecutively with a battery in 2009.

20        And so with the two of those kind of running

21 simultaneously, you then have that time -- you have

22 revocations that occurred.  You also have while the

23 defendant -- in 2017, you have the dealing in methamphetamine,

24 which is also a case that he was on active supervision for at

25 that time, coupled with the possession of methamphetamine.

Both of those cases, he was on active supervision while the conduct in this case occurred.

Moving forward, I think even with the dealing in methamphetamine and the strangulation case in 2017, which are both separate cases, those cases may have been served.  I looked at probably maybe the most combined time served was maybe a little over two years.  The time is a little uncertain as to being in and kind of being out, with the cases kind of happening concurrently because what you'll see is those cases are sort of overlapping.  You have a criminal arrest in one case, and later you have -- for example, you have the fraud case on paragraph 43 in Boone County, which is May of 2017; and then you have a conviction August of 2017; and then you have paragraph 44, possession of methamphetamine.

So while on probation for another case in another county, you have paragraph 44 that occurred.  That really is a theme throughout his entire criminal history.  It's -- you have these multiple, multi-county -- he's a multi-county offender and a multi-state offender, from Florida, to Tennessee, to Indiana.

And even in Indiana, you have Marion County, Boone County, Owen County, Hendricks County, all of those counties that this particular defendant has caused either significant harm or has been a danger to the public in all of those instances.

1    His criminal history over time, every time

2 sentenced, and even some of the most recent cases where it

3 appears that the Court really provided some sense of grace in

4 allowing alternative measures, where they've tried the mental

5 health, you see where they've also tried probation or

6 community corrections.  They provided teams for him; and

7 consistently, he has violated either the Court's order or

8 refused to comply with probation or community corrections.

9    He is a strong case is why I'm arguing for the end

10 of that guideline range.  It's 92 to 115.  I say 115 gets the

11 point and gets the message across for this particular

12 defendant.  I do think it does make a difference, because

13 grace has been extended so many times throughout his history

14 since 2003, that nothing -- I mean, there are eight felony

15 convictions.  There have been eight plea colloquies and

16 sentencings.  There have been multiple revocations that start

17 from community corrections on paragraph 37 and paragraph 38.

18 Both of those were revoked.  You have the probation violations

19 at paragraph 34 and also his probation violated, supervision

20 violated.

21    Paragraph 36, in that particular case, you have

22 the -- sorry -- yes, paragraph 36, probation violated in 2009;

23 and we have the paragraph 37, which was the battery case,

24 where that probation was revoked in 2011.  You have paragraph

25 41, which is the strangulation, probation revoked in 2018.

You have paragraph 42, dealing in methamphetamine, probation revoked.

So we -- usually, I think we see sort of, like, a particular area of crime that maybe one defendant may focus on or we see where one starts sort of with smaller crimes and then maybe end up towards more violent crimes or crimes with higher penalties.

Here we have a mix of various concerning, violent felonies, strangulation, the battery, with -- and the United States argues that that was a battery that resulted in serious bodily injury. If not, the victim in that particular case was a pregnant victim. You have the strangulation.

Then we have the substance abuse, the possession of methamphetamine; but we also show that he is a convicted dealer of methamphetamine. So on one end you have burglary -- it starts as burglary. Then we have theft or fraud in 2007. So 2003, burglary; 2007, fraud; 2009, theft; and then 2017, fraud. So from 2003 to 2017, still committing the same type of acts and crimes. And then from 2009, you have the battery; and then we've come forward to 2017, the strangulation.

And all of these instances at this point on February 19th of 2019, he clearly knew that he should not have had a firearm; but we had two, and loaded firearm at that, which is extremely concerning, seeing that his conduct does not end peacefully. In most of these instances where police

1  are arriving, they are arriving on dangerous circumstances or

2  very concerning circumstances; and so there are other

3  instances to where, you know, he is being pulled over; and,

4  you know, there's dangerous conduct that may be afoot.  And so

5  the United States' position, that nothing gets the point

6  across to this defendant.

7          And the offense conduct as far as what this

8  guideline suggests is that he is a candidate to be at the end

9  of the guideline range.  The 115 is more than sufficient but

10 not greater than necessary to get the point across because

11 what we have seen is that nothing in almost 20 years has done

12 that.  And a person in 20 years has eight felony

13 convictions -- and I'm not even counting all of the

14 misdemeanor convictions in between.  So a person who has taken

15 so many pleas and so many -- has been sentenced so many times

16 has not received the point.

17          And so the point here is what is significant, what

18 is sufficient but not greater than necessary.  The United

19 States feels strongly and firmly that 115 months is

20 significant in this particular case.  It is sufficient and the

21 reason why I use those two terms is that there needs to be

22 some type of deterrent value to this defendant and the public

23 for others that want to follow behind this type of criminal

24 behavior and believe that every time that he comes before the

25 Court, that grace will be extended or, "If I say the right

1    things this time, maybe I'll get yet another break."

2          And the breaks haven't rendered any changed

3    behavior, and that is the point why 92 months would not be

4    sufficient to establish the deterrent value for this

5    particular defendant because even giving that much, it is my

6    position that it gives him that, "I still am getting grace.

7    I'm getting favor over it or I was able to get something"; but

8    the point being driven here is that yes, he's accepted the

9    responsibility; and we acknowledge that and the additional

10   point -- and I don't agree with that; but here is even post

11   this case, what will his behavior look like and what could

12   this sentence do to shape that?  And it is my belief on behalf

13   of the United States that 115 months is sufficient but not

14   greater than necessary, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          Now, Mr. Modglin, in trying to fashion a sentence to

17   impose that is sufficient but not greater than necessary to

18   serve the purposes set forth in 3553(a), the Court considers a

19   lot of things, to include the letters in support that you have

20   submitted, your certificates of participation from the Star

21   Mentor Program, the statements of counsel, as well as your

22   letter or statement today.

23          And then the Court looks at the factors set forth in

24   Section 3553(a), beginning with the nature and circumstances

25   of the offense, which is a serious offense.  Gun violence is

1  plaguing our streets and are often involved with drugs, which

2  are a scourge on our society, which you have some of that

3  history as well, as Mr. Morris has pointed out aptly this

4  morning. And so it is a serious offense.

5        I look at the history and characteristics of the

6  defendant; and certainly, you had a rough and challenging

7  childhood life, marked by some abuse, lack of role models, as

8  you said, someone to teach you how to be a man, some traumatic

9  losses, days of -- well, drugs, alcohol, some mental health

10  problems but an extensive criminal history.

11        Now, again, Mr. Morris went over that in detail.

12  You and I discussed some of it, to include the domestic

13  violence things; to include this particular one that I had a

14  discussion with Mr. Borland about with respect to -- and I

15  think he's right. You're lucky -- or maybe Mr. Morris said

16  you're lucky that this didn't get out of hand, being

17  intoxicated behind a running vehicle in the street with two

18  weapons loaded. Who knows what could have happened? Those

19  are not ingredients that typically lead to success when

20  confronted by police officers or others.

21        Looking at some of these other ones, again, we've

22  talked about the penchant, the history here of domestic abuse;

23  and Mr. Morris pointed out the battery -- the felony battery

24  in paragraph 37 and suggested that that was a battery with

25  serious bodily injury. The Court does not see that that is

1  set forth in there and did have an occasion with respect to

2  the objection under ACCA to look at that and to see that the

3  statute requires bodily injury with a dangerous weapon, which

4  there's no indication of that, or to an endangered person,

5  which there is an indication of that with respect to the

6  pregnancy.  Of course, we don't have the judgment; so we don't

7  know for sure, but it's troubling.  Those kinds of things are

8  troubling.  That's why we try to protect endangered people and

9  elevate that to a C felony.

10           And as Mr. Morris pointed out, lots of opportunities

11 for leniency, followed by violations and revocations on

12 numerous occasions of community corrections and probation.

13           Now, as Mr. Borland pointed out and as the Court

14 saw, you accepted responsibility.  You expressed remorse; and

15 as he eloquently argued, much of this may be due to your

16 mental health problems, which you indicated led to

17 self-medication, which, of course, under the influence of

18 anything, drugs or alcohol or anything else, that maybe helps

19 us not make good decisions.  So the Court takes those things

20 into account.

21           I need to look at the need for the sentence imposed

22 to reflect the seriousness of the offense, which we said is

23 serious; to promote respect for the law.  We've talked about

24 the lengthy criminal history marked by these violations don't

25 evidence any respect for the law.

1          The need to provide just punishment for the offense,

2     to afford adequate deterrence to criminal conduct, not only to

3     deter you but to deter others; to protect the public from

4     further crimes of the defendant and provide the defendant with

5     needed educational or vocational training, medical care, or

6     other correctional treatment in the most effective manner.

7          I've looked at the kinds of sentences available.

8     I've looked at the kinds of sentence and the sentencing range

9     established for the applicable category of offense committed

10    by the applicable category of defendant as set forth in the

11    advisory sentencing guidelines.

12         And then I also need to make sure to avoid

13    unwarranted sentence disparities among defendants with similar

14    records who have been found guilty of similar conduct.  So

15    I've looked at that as well.

16         Taking all that into account, I'll now state the

17    sentence the Court intends to impose.  This will be pursuant

18    to the Sentencing Reform Act of 1984.  It's the judgment of

19    the Court that the defendant, Brandon Modglin, is hereby

20    committed to the custody of the Bureau of Prisons, to be

21    imprisoned for a term of 55 months on each of Counts 1 and 2

22    served consecutively for a total of 110 months.

23         The sentence will address the seriousness of the

24    offense and the defendant's personal history and

25    characteristics, as well as provide adequate deterrence, just

1  punishment, and protection to the public.

2          The defendant shall forfeit to the United States a

3  Smith and Wesson .40 caliber handgun; ten rounds of .40

4  caliber ammunition; a Walther .22 caliber handgun; and seven

5  rounds of .22 caliber ammunition.

6          The Court is not imposing a fine based on the

7  determination the defendant does not have the ability to pay.

8          A term of supervised release is not required by

9  statute.  However, a term of three years per count served

10 concurrently is ordered, based on his history and

11 characteristics and to aid in his rehabilitation and

12 reintegration into society.

13         While on supervised release, the defendant shall not

14 commit another federal, state, or local crime; shall cooperate

15 with the collection of a DNA sample; shall refrain from any

16 unlawful use of a controlled substance; and shall submit to

17 one drug test within 15 days of placement on supervised

18 release and two periodic tests thereafter as directed by the

19 probation officer.

20         The defendant shall also comply with all proposed

21 conditions of supervised release referenced in the presentence

22 report, formal reading of which the defendant has waived.

23         It is further ordered that the defendant pay a

24 special assessment of $200.  Payment of the special assessment

25 is due immediately and is to be made directly to the clerk,

1  U.S. District Court.

2          Mr. Morris, do you have any legal objection to the

3  sentence I have just stated I intend to impose or request any

4  further elaboration of my reasons under 3553(a) as to the

5  length of imprisonment or as to the length and/or conditions

6  of supervised release?

7          MR. MORRIS:  No, Your Honor.

8          THE COURT:  Mr. Borland?

9          MR. BORLAND:  No, Your Honor.

10          THE COURT:  All right.  I'm going to recommend,

11  Mr. Modglin, substance abuse treatment, to include RDAP;

12  mental health evaluation and treatment; vocational training in

13  the barber arts; anger management; financial management; GRE

14  programming; educational programming; and prison industries.

15          Any argument for placement, Mr. Borland?

16          MR. BORLAND:  As close to Indianapolis as possible,

17  Your Honor.

18          Is that not true?

19          THE DEFENDANT:  Atlanta.

20          MR. BORLAND:  I'm sorry.  His family is in Atlanta.

21  I'm sorry, Judge.

22          THE COURT:  All right.  I will recommend as close to

23  Atlanta as appropriate, giving due consideration to these

24  programs, which will be of great help to you.  So we'll -- so

25  where those are located as well.

1    With that, the Court orders the sentence imposed as

2  stated.  Now, I can only make those as recommendations.  The

3  Bureau of Prisons does not have to follow them, Mr. Modglin.

4  Do you understand that?

5    THE DEFENDANT:  Yes, sir.

6    THE COURT:  Now, you can appeal your conviction if

7  you believe that your guilty plea was somehow unlawful or

8  involuntary or if there's some other fundamental problem in

9  the proceedings that was not waived by your guilty plea.  Do

10  you understand that?

11    THE DEFENDANT:  Yes, sir.

12    THE COURT:  You also have the right to appeal your

13  sentence.  Do you understand that?

14    THE DEFENDANT:  Yes, sir.

15    THE COURT:  Now, any notice of appeal generally must

16  be filed within 14 days of the entry of judgment.  If you

17  cannot afford the filing fee or cannot afford to pay a lawyer

18  to appeal for you, then the Court will appoint a lawyer to

19  represent you on appeal.  Also, you may request the Clerk of

20  Court to prepare and file a notice of appeal on your behalf.

21    Do you have any questions about your appellate

22  rights or the 14-day time limit for filing your notice of

23  appeal?

24    THE DEFENDANT:  No, sir.

25    THE COURT:  I think it's important, Mr. Modglin, to

1  realize the past doesn't define you.  You've had some things

2  you've had to overcome, chief among those I think is your

3  addiction, maybe your mental health things.  Neither one of

4  those makes you a bad person, but it's where you go from here

5  that will tell that.

6         We've recommended some good programs for you, so

7  please apply yourself to those; and as has been said here

8  today, you're lucky to be alive.  You're lucky to have

9  Mr. Borland representing you.  You're lucky that this incident

10 didn't go violently and terribly wrong; and you have the

11 chance to, in your words, maximize your potential and become a

12 productive citizen; but that future is up to you, sir; and as

13 I said, part of that, as you said, is respecting yourself.  So

14 let's get you to that point.

15        With that, you are remanded to the custody of the

16 marshal.

17        Is there anything further for the government?

18        MR. MORRIS:  No, Your Honor.

19        THE COURT:  Anything further for the defendant?

20        MR. BORLAND:  No, Your Honor.  Thank you.

21        THE COURT:  All right.  Mr. Modglin, I wish you

22 luck, sir.

23        COURTROOM DEPUTY:  All rise.

24        *(The proceedings were adjourned at 11:48 a.m.)*

25

1          <u>CERTIFICATE OF COURT REPORTER</u>

2

3        I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8      /s/ Cathy Jones                        January 31, 2021
       _____
9      CATHY JONES, RDR, FCRR
       Official Court Reporter
10     Southern District of Indiana
       Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25